UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MILAN HEGGS,

                              Plaintiff,

                    -against-

THE CITY OF NEW YORK, NEW YORK CITY
HEALTH AND HOSPITALS CORPORATION,
CORIZON, INC., CORIZON HEALTH, INC.,
CORIZON HEALTH CLINICAL SOLUTIONS, LLC,
CORRECTIONAL MEDICAL ASSOCIATES OF
NEW YORK, P.C., DR. RAUL RAMOS, RODERICK
WILLIAMS, DR. HOMER VENTERS, DR. JAY
COWAN, DR. ROSS MCDONALD, DR. FRANKLIN
MEJIA, DR. KATZ, NINA EDWARDS, ASSISTANT
DEPUTY WARDEN LILLIAN BENBOW, WARDEN
CAROLYN SAUNDERS, C.O. CARLOS SANCHEZ,
OFFICER C.O. DAIN DEALLIE, C.O. JERMAIN
PHILLIPS, CAPTAIN JASON FERNANDEZ,
MEDICAL DOES 1 – 7, C.O. DOES 1 – 7,

                              Defendants.

---

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

**No. 18 Civ. 9709 (RA) (RWL)**

---

## PRELIMINARY STATEMENT

1.      On or about May 3, 2015, Plaintiff Milan Heggs, at the time a forty-year-old

paraplegic with a with a disability requiring an assisted mobility device, was arraigned on charges

and taken to Riker's Island to await trial.

2.      At the outset of his detention at Rikers Island, Mr. Heggs was refused his proscribed

pain medication, but was initially provided certain accommodations for his disability, including

his personal braces and wheelchair for mobility. At first, Mr. Heggs was housed at the North

Infirmary Command ("NIC") which was structurally more disability accommodating and

accessible than other housing unit, and equipped with accommodating beds and restrooms.

1

3.      Five months after his detention began, Mr. Heggs was the victim of an attack by another inmate at the NIC.  Based upon a mistaken belief that Mr. Heggs had initiated the fight, but with no justification under the law, Defendants took retribution on Mr. Heggs by confiscating his assisted mobility devices and placed him in an isolation cell for four days without any assistance to ambulate nor accommodation to comfortably rest.

4.      Without reasonable medical basis, Mr. Heggs was then "cleared" to walk and was transferred out of the NIC to an upper floor at the Otis Bantum Correctional Center ("OBCC") where Mr. Heggs, a paraplegic with a well-document mobility disability, was routinely forced to go up and down flights of stairs with only the aid of leg braces and a cane.

5.      Unsurprisingly, Mr. Heggs fell on multiple occasions and otherwise experienced injury, pain, hardship, and fear for his personal safety as a result of Defendants' denial of a reasonable accommodation.

6.      Mr. Heggs was held in this impermissible manner at Rikers for close to two years, during which time Mr. Heggs and advocates working on his behalf repeatedly requested his return to a disability accommodating unit at the NIC, the return of his assisted mobility devices, and the reasonable accommodation of his disability as required by law.

7.      Instead, with a clear awareness of the ongoing denial of reasonable accommodation to Mr. Heggs, Defendants only provided degrading and discriminatory treatment, and otherwise violated Mr. Heggs's rights as a pre-trial detainee.

8.      Because pre-trial custody occurs before an individual has been convicted of a crime, the constitutionally permissible conditions of confinement for pre-trial detainees are not governed by the more lenient bounds of the Eighth Amendment prohibiting cruel and unusual punishment.

Pre-trial detainees cannot be subject to any punishment in response to or in retaliation for the alleged basis underlying the arrest and criminal charges filed against them.

9. Plaintiff brings this action against Defendants alleging violations of the Americans with Disabilities Act, the Rehabilitation Act of 1973, the Civil Rights Act of 1871 (amended and codified as 42 U.S.C. § 1983), and the New York City Human Rights Law, for failing to provide reasonable accommodation, discriminating against him because of his disability, subjecting him to unconstitutional conditions of confinement, and for the deprivation of rights accorded by the Fourth and Fourteenth Amendments to the United States Constitution.

10. This complaint seeks compensatory damages, punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4). This action is brought pursuant to the Americans with Disabilities Act of 1990, amended and codified as 42 U.S.C. § 12132, et seq. ("ADA"); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq. ("Rehabilitation Act"); 28 C.F.R. Part 35; and the Civil Rights Act of 1871, 42 U.S.C. § 1983, for violations of the Fourth and Fourteenth Amendments to the Constitution of the United States.

12. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that Plaintiff's claims arose in the Southern District of New York, within the confines of this judicial district.

13. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §§ 1988 and 12205.

## JURY TRIAL

14.     Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a jury trial.

## PARTIES

15.     Plaintiff Milan Heggs was at all times relevant to this action a resident of the County of Queens and the City and State of New York. Mr. Heggs is paraplegic due to a bullet becoming inoperably lodged near his L3 vertebrae when he was only fifteen years old. The resulting paralysis requires him to use a wheelchair or other assisted mobility device. Mr. Heggs's disability substantially limits one or more of his major life activities, including his ability to walk. On the basis of his condition, Mr. Heggs is and was at all times relevant to this action a qualified individual within the meaning of the ADA and the Rehabilitation Act.

16.     Defendant City of New York ("City") is a municipal corporation organized under the laws of the State of New York. It is authorized by law to maintain a Department of Correction ("DOC") which acts as its agent in the area of corrections for which it is ultimately responsible. Defendant City assumes the risks incidental to the maintenance of the DOC and the employment of corrections officers as said risks attach to the public consumers of the services provided by the DOC.

17.     Defendant City, as defined by the laws of the City of New York, is a government entity and thereby qualified as a "public entity" within the meaning of Title II of the ADA, as that term is defined under 42 U.S.C.§ 12131(1) and C.F.R. § 35.104.  Defendant City receives federal financial assistance within the meaning of Section 504 of the Rehabilitation Act.  Defendant City, and its agencies including the DOC, is responsible for constructing, repairing, and maintaining

4

police stations and pre-trial holding facilities in New York City, and for issuing guidance as to the reasonable accommodation to be provided to detainees with mobility-based disabilities.

18.    Upon information and belief, the City operates and manages the custody of pre-trial detainees held at Rikers Island, receives federal funding for the same, and through its senior officials promulgates and implements policies. These policies include compliance with federal, state and local disability laws, reporting, and investigation of compliance by staff and of facility conditions, including operating and overseeing any repairs to buildings, accommodating persons with disabilities, access to medical and other program services mandated by law.

19.    In addition, senior officials of the City are aware of and tolerate certain practices by subordinate employees in the jails, including those that are inconsistent with formal policy. These practices, because they are widespread, long-standing, and deeply embedded in the culture of the City, constitute unwritten City policies or customs. Defendant City is also responsible for the appointment, training, supervision, and conduct of all City personnel, including the Defendants referenced herein.

20.    Defendant New York City Health and Hospitals Corporation (HHC) is an agency of Defendant City, separately incorporated as a public benefit corporation formed under the laws of the State of New York. Upon the City canceling the contract with Corizon, HHC became responsible for inmate medical care at Rikers Island as an agent and/or agency of the Defendant City.

21.    Upon information and belief, Defendant Corizon, Inc. is a corporation that contracted to provide health services to pretrial detainees in the custody of the DOC.

22.     Upon information and belief, Defendant Corizon Health, Inc. is a corporation that contracted with the Defendant City to provide health services to pretrial detainees in the custody of the DOC.

23.     Upon information and belief, Defendant Corizon Health Clinical Solutions, LLC is a limited liability corporation that contracted to provide health services to pretrial detainees in the custody of the DOC.

24.     Upon information and belief, Defendant Correctional Medical Associates of New York, P.C. is a professional corporation that contracted with the Defendant City to provide health services to pretrial detainees in the custody of the DOC.

25.     Defendants Corizon, Inc., Corizon Health, Inc., Corizon Health Clinical Solutions, LLC, Correctional Medical Associates of New York, P.C., will be collectively known as ("Corizon"). Defendants Corizon are entities that have contracted with the Defendant City to provide health services to pretrial detainees in the custody of the Defendant City. Defendants Corizon engage in business in the State of New York, are subject to personal jurisdiction in this district, and have provided health care services on behalf of Defendant City.

26.     Dr. Raul Ramos was the chief physician at the North Infirmary Command, first for Corizon and now under HHC, and was responsible for treatment of individuals at NIC and the medical clearance or transfer of individuals out of NIC.

27.     Roderick Williams was at all times relevant the Assistant Commissioner of Health Affairs for DOC.

28.     Dr. Homer Venters was an Assistant Commissioner of Correctional Health Services at the Department of Health, and then an employee of the New York City Health and Hospitals Corporation.

29.    Dr. Jay Cowan was at all times relevant an employee of Corizon.

30.    Nina Edwards is and was the disability rights coordinator of the DOC, designated with the responsibility to coordinate DOC efforts to comply with DOC obligations under the ADA with respect to inmates at Rikers.

31.    Dr. Ross McDonald was the Assistant Medical Director, and then was and is the Medical Director of Correctional Health Services.

32.    Dr. Franklin Mejia and Dr. Katz were medical professionals with authority concerning the care of inmates at Rikers, including Mr. Heggs. Dr. Mejia and Dr. Katz were in part responsible for the denial of physical therapy treatment to Mr. Heggs.

33.    C.O. Carlos Sanchez, C.O. Dain Deallie, C.O. Jermain Phillips were the DOC Correction Officers who searched and used force against Plaintiff on October 3, 2018, as alleged below.

34.    Captain Jason Fernandez was a DOC Captain who directed C.O.s Sanchez, Deallie, and Phillips to search and use force against Plaintiff on October 3, 2018, as alleged below.

35.    Defendants Medical Does 1 – 7 are the individuals who approved or caused the transfer of Mr. Heggs from the NIC to OBCC and/or approved the confiscation and withholding of Mr. Heggs' assisted mobility devices, and/or denied Mr. Heggs a reasonable accommodation of his disability.

36.    Defendant Assistant Deputy Warden Lillian Benbow and Defendant Warden Carolyn Saunders had supervisorial authority over inmates at OBCC, reviewed and approved the transfer of Plaintiff from the NIC to OBCC, had primary responsibility for Mr. Hegg's placement and conditions of confinement at OBCC, and were aware of Plaintiff's repeated complaints concerning the denial of a reasonable accommodation or access to a wheelchair.

7

37.    Defendants Correctional Officers ("C.O.") Does 1 – 7 are the individuals who approved or caused the transfer of Mr. Haley from the NIC to OBCC and/or approved the confiscation and withholding of Mr. Heggs' assisted mobility devices, and/or denied Mr. Heggs a reasonable accommodation of his disability.

a.   Defendant C.O. Doe # 14510 signed Mr. Heggs's wheelchair receipt at the time that his personally fitted wheelchair was taken from him and was otherwise involved in the confiscation and deliberate withholding of Mr. Heggs's wheelchair.

b.   Officer "Hall" Doe, Officer "Johnson" Doe, and Captain "Williams" Doe were among the corrections officers responsible for Mr. Heggs's care while he was held in an isolation cell for four days without access to any assisted mobility device.

c.   Defendant C.O. "Dinali" Doe denied Mr. Heggs access to the yard on at least one occasion based only upon Mr. Heggs's his need for an assisted mobility device.

38.    Dr. Raul Ramos, Roderick Williams, Dr. Homer Venters, Dr. Jay Cowan, Dr. Ross McDonald, Dr. Franklin Mejia, Dr. Katz, Nina Edwards, Assistant Deputy Warden Lillian Benbow, Warden Carolyn Saunders, C.O. Carlos Sanchez, C.O. Dain Deallie, C.O. Jermain Phillips, Captain Jason Fernandez, and C.O. Does and Medical Does (including C.O. "Johnson" Doe, Captain "Williams" Doe, C.O. Doe # 14510), are referred to collectively as the "Individual Defendants" and they are sued in their individual capacities.

39.    The Individual Defendants were at all times relevant herein employees or agents of Corizon and/or City and were acting under color of state law in the course and scope of their duties and functions as agents, servants, and employees of Corizon and/or City and otherwise performed and engaged in conduct incidental to their lawful functions in the course of their duties. They were acting for and on behalf of Corizon and/or City at all times relevant herein, with the power and

authority vested in them as agents and employees of Corizon and/or City and incidental to their duties as agents and employees of Corizon and/or City. They are sued in their individual capacities.

40. At all relevant times, the Defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

41. The Defendants' acts hereafter complained of were carried out intentionally, recklessly, or with malice, and or a gross disregard for Mr. Heggs.

42. The true names and shield numbers of Defendants C.O. Does and Medical Does are not currently known to Mr. Heggs. However, John Doe Defendants were employees or agents of the Defendant City, on the date of the incident, October 22, 2015, and thereafter. Accordingly, they may be entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to New York State General Municipal Law § 50-k. The Law Department, then, is hereby put on notice (a) that Mr. Heggs intends to name said officers as Defendants in an amended pleading once their true names and shield numbers become known and (b) that the Law Department should immediately begin preparing their defense(s) in this action.

## STATEMENT OF FACTS

### *Mr. Heggs's ADA qualifying mobility disability*

43. At the time of this incident, Plaintiff Mr. Heggs was a forty-year-old man and a qualified individual with a disability as defined under the ADA. Mr. Heggs has required the use of a wheelchair and/or prosthesis for approximately twenty years due to a gunshot wound in which a bullet became inoperably lodged in or near his spine when he was fifteen years old. Mr. Heggs became an L3 paraplegic as a result of the injury.

9

44.    In addition to his partial paralysis, Mr. Heggs has a severe foot drop, and is unable to walk or stand without an assistive device.

45.    Mr. Heggs requires an accommodation in order to use a toilet.

46.    To stand and/or ambulate even short distances, Mr. Heggs requires the use of an appropriate leg brace/prothesis, one that locks his knee in place, and a cane.

47.    A wheelchair is required for Mr. Heggs to traverse longer distances.

48.    During all times herein Mr. Heggs had ownership of an appropriately fitted wheelchair that provided him with the back support needed to accommodate his disability and condition, though this chair was confiscated and withheld for approximately three years by Defendants.

***Mr. Heggs's arrival at Rikers Island***

49.    On April 30, 2015, Mr. Heggs was involved in a car accident, after which he was arrested, and thereafter remanded to City custody at Rikers Island.

50.    On or about May 3, 2015, Mr. Heggs arrived at Rikers Island and proceeded through the intake process after which he was transferred to the NIC on or about May 5, 2018.

51.    Shortly thereafter Mr. Hegg's wheelchair and prothesis, both of which had been confiscated at the time of Mr. Heggs's arrest and pre-arraignment confinement, were returned to him.

52.    Mr. Heggs was housed at the NIC through the end of October, during which time he repeatedly requested the pain medication that he had been prescribed to treat his injuries from the April car accident.  He was refused this pain medication during that time.

53.    Initial medical evaluations of Mr. Heggs conducted by Defendants in the first couple of months of detention confirmed that Mr. Heggs was paraplegic with a foot drop, and that

he requires a supportive device to stand, a leg brace with a locking mechanism at the knee in order to walk short distances with assistance of a cane, and a wheelchair to ambulate more generally. It was determined that Mr. Heggs required specialized footwear to accommodate his foot drop and that without assisted mobility devices Mr. Heggs could not walk at all. Finally, it was confirmed that Mr. Heggs required physical therapy to counter the ongoing deterioration of his condition.

***Isolation: the unjustifiable confiscation of assisted mobility devices***

54.    On October 22, 2015, Mr. Heggs was attacked by another inmate in the NIC, wherein the inmate threw bleach in Mr. Heggs's face, and a scuffle ensued. The inmates were separated.

55.    For reasons that are unclear, Mr. Heggs was about that time discharged from physical therapy as approved by Defendant Dr. Franklin Mejia.

56.    As a result of the October 22 incident, medical staff including, upon information an belief, Defendant Dr. Raul Ramos, and DOC staff, including Defendant Assistant Deputy Warden Lillian Benbow and Defendant Warden Carolyn Saunders, directed that Mr. Heggs be punished by transferring him out of the medical unit at the NIC to OBCC, and directed the confiscation of Mr. Heggs's assisted mobility devices.

57.    To supposedly justify this transfer, Defendants held medical appointment at which Mr. Heggs – who was registered as a paraplegic - was allegedly "cleared" to be transferred from medical housing. Defendants informed Mr. Heggs: "You have to start walking."

58.    No written explanation was provided to Mr. Heggs for the confiscation of his assisted mobility devices, his transfer to OBCC Upper Tier, nor his forced time in an isolation cell.

59.    On November 4, 2016, Mr. Heggs requested that medical re-evaluate his transfer given his documented mobility disability.

11

60.    On or about November 5, 2015, at the direction of Defendants, officers entered Mr. Heggs's cell and confiscated his wheelchair, placed him on a gurney to which he was handcuffed, and brought him to an isolation cell, where Mr. Heggs was left without his wheelchair, prothesis/brace, or cane.

61.    Mr. Heggs was left in the isolation cell, upon information and belief at OBCC, by Defendants from approximately November 5 through November 9 of 2015.  During this time his care was, in part, under the supervision of Captain "Williams" Doe and Officer "Johnson" Doe, who were aware that Mr. Heggs had a mobility disability and was being denied access to any assisted mobility device.

62.    The isolation cell was dirty, had no proper bed and only a concrete bench on which Mr. Heggs was forced to sleep, despite his documented paraplegia and there being a bullet lodged in his spine rendering such sleeping conditions painful.

63.    The toilet in the cell was not handicapped accessible and had no appropriate safety rails installed. Mr. Heggs would urinate into an empty milk carton and/otherwise had difficulty moving his bowels, as it required him to unsafety support himself utilizing only the sink and the toilet bowel.

64.    Mr. Heggs continued to be denied access to his previously prescribed pain medication and was denied access to a shower on multiple occasions, only being permitted to bathe once during his time in the isolation cell.

65.    When Mr. Heggs requested medical attention, these requests were also denied.

66.    On November 6, 2015, an advocate working on behalf of Mr. Heggs filed a letter complaint, which was sent directly by email to Defendants Dr. Homer Venters, Dr. Jay Cowan, Roderick Williams, and Nina Edwards, as well as other New York City Health and Hospitals Corp

12

personnel.  The letter notes, "[F]or reasons which we cannot fathom, Mr. Heggs (sic), a paraplegic with "foot drop" who needs a wheelchair, has been moved from the NIC Infirmary to an upper tier at OBCC <u>after</u> our request for him to stay at NIC as a reasonable accommodation of his disability . . . his wheelchair has been taken from him."

67.    On or about November 11, 2015, Mr. Heggs filed a grievance concerning his time in the isolation cell and the corresponding confiscation of his assisted mobility devices.

***Ongoing Denial of a Reasonable Accommodation***

68.    On or about November 9, 2018, after the time in the isolation cell, Mr. Heggs was transferred by Defendants to new housing within the general population at OBCC.

69.    Mr. Hegg's personal wheelchair was not returned to him (nor has it been since), and instead Mr. Hegg was placed in housing on the OBCC 8 Upper Tier. The Upper Tier housing placement required that Mr. Heggs routinely traverse stairs.

70.    Mr. Heggs was given only use of a cane and his leg braces, and was otherwise denied access to a wheelchair for mobility at OBCC for over a year.

71.    As a direct result of the denial of access to the reasonable accommodation of an appropriate assisted mobility device and appropriate housing, Mr. Heggs fell multiple times while attempting to access the services available to other inmates, including showers, food, etc.

72.    Each fall caused Mr. Heggs physical injury, pain, and emotional distress. Additionally, Mr. Heggs experienced general physical discomfort and fear for his safety.

73.    Defendants used Mr. Heggs's disability and need for an assisted mobility device as a basis to deny access to services and programs afforded to other inmates otherwise similarly situated at OBCC, including access to the yard for recreation.  Mr. Heggs was denied access to the yard with his required cane on approximately fifteen occasions.

13

74.    On November 16 and 20 of 2015, Mr. Heggs filed grievances concerning his placement at the Upper Tier and the fact this housing placement was unsafe in light of his disability and his actually falling down the stairs.  Mr. Heggs noted his ongoing fear of further injury.  Mr. Heggs requested the return of his wheelchair.

75.    On November 24, 2015, Mr. Heggs reported his ongoing difficultly with the stairs in the Upper Tier housing to medical staff.

76.    On or about January 9, 2016, Mr. Heggs filed a grievance concerning once instance in which he was denied access to the yard by Defendant C.O. "Dinali" Doe, who demanded that Mr. Heggs turn in his cane that he needed to ambulate in order to enter the yard. Mr. Heggs informed this officer that he was a qualified individual with a disability and had supporting paperwork, to which C.O. "Dinali" Doe responded that he didn't care and that Mr. Heggs could not access the yard.

77.    On February 8, 2016, Mr. Heggs reported to medical his ongoing difficulty utilizing the toilets given the failure to provide him with a reasonable accommodation, including stabilization bars and/or a wheelchair.

78.    In or about the end of March/beginning of April of 2016, Mr. Heggs was transferred to the Anna M. Kross Center ("AMKC") on Riker's Island.

79.    On or about October 27, 2016, Mr. Heggs filed a grievance noting the failure to adhere to the ADA in that both the showers and toilets did not have handrails and were therefore inaccessible and/or unsafe for his use.

80.    On or about November 3, 2016, the criminal court judge on Mr. Heggs's case ordered Defendants to provide Mr. Heggs with a wheelchair.  Defendants complied with this Order

only for the purpose of bringing Mr. Heggs to and from court appearances before that judge and otherwise continued to deny Mr. Heggs access to his wheelchair.

81.    During the course of Mr. Heggs's incarceration at Rikers but outside the appropriate medical housing unit of the NIC, his personal braces originally fit to Mr. Heggs's legs began to become ill fitted due to weight loss, causing the braces to move around and cut into his legs in a manner that made these braces no longer usable.  His legs became bruised, puffy, and appeared infected.

82.    Defendants failed to properly replace or readjust these braces for many months and yet still denied Mr. Heggs access to a wheelchair during this time.

83.    Although Defendants had initially documented Mr. Heggs's need for ongoing physical therapy due to atrophy and the gradual deterioration of his condition, they denied Mr. Heggs such treatment for most of his incarceration at Rikers Island.

84.    The ongoing denial of physical therapy was in part reviewed and continued at the direction of Defendant Dr. Katz.

85.    On or about August 30, 2017, Mr. Heggs was finally transferred back to the NIC, over eight months after Defendant Nina Edwards cleared Mr. Heggs's transfer "pending available bed space."

86.    Mr. Heggs otherwise continued to be denied certain prescription pain medications, replacement leg braces, his personally fitted wheelchair, a bed providing support for his back, and the supportive footwear necessary to reasonably accommodate his foot drop.

87.    On or about September 20, 2017, an advocate working on behalf of Mr. Heggs sent a letter complaint directly by email to Defendant Dr. Ross McDonald and Defendant Nina Edwards, among other Health and Hospitals personnel, in which it notes that Defendants had failed

15

to properly replace Mr. Hegg's braces and yet still had not provided him with a wheelchair, noting that the braces cut into his leg and broke apart.

88.    On December 8, 2017, a letter was sent by email directly to a board member of the New York City Board of Correction, detailing the ongoing and alarming denial of treatment and disability accommodation provided to Mr. Heggs at Rikers.

89.    The New York City Board of Correction board member responded on January 11, 2018, stating: "I share your concern about the NIC annex infirmary and the lack of availability of appropriate wheelchairs.  I visited the NIC Annex facility last fall and, sadly, your description is consistent with my tour."

90.    At no time did Defendants provide a reasonable justification to Mr. Heggs as to why his personal, appropriately fitted, wheelchair had been confiscated and not returned to him in over three years.

***The Brutal Assault of Mr. Heggs***

91.    On October 3, 2018, Defendants C.O.s Deallie and Sanchez performed an unscheduled body search of Mr. Heggs under the direction of Defendant Captain Fernandez.

92.    Defendants C.O.s Deallie and Sanchez ordered Mr. Heggs to remove all clothing.

93.    Defendants then demanded that Mr. Heggs move from the provided wheelchair in which he sat to a regular chair that appeared to be covered with grime.

94.    Mr. Heggs refused, and then requested that Defendants at least clean off the chair before he attempted to sit his naked body on it.

95.    In response, Defendant Captain Fernandez directed Defendant C.O.s Deallie, Sanchez, and Phillips to throw Mr. Heggs onto the floor, which they did. C.O.s Deallie and Sanchez held Mr. Heggs to the ground on his stomach by his arms and C.O. Phillips restrained his

legs. Defendants C.Os. Deallie, Sanchez and Phillips forcibly "searched" Mr. Hegg anally with no conceivable justification.

96.     As a result of Defendants' acts and omissions, Mr. Heggs sustained serious injuries to his physical and emotional well-being, including, *inter alia*, denial of liberty, physical and mental pain, suffering, humiliation and mental anguish.

**FIRST CAUSE OF ACTION**
**PURSUANT TO 42 U.S.C. § 12131 *et seq.***
**AMERICANS WITH DISABILITIES ACT**
***(Against All Defendants)***

97.     Plaintiff repeats and re-alleges each of the above paragraphs with the same force as if set forth herein.

98.     Title II of the ADA, prohibits a public entity from excluding a person with a disability from participating in, or otherwise benefiting from, a program of the public entity, or otherwise discriminating against a person on the basis of disability. 42 U.S.C. § 12132. "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

99.     "Public entities" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1).   Defendant City is a public entity.

100.    The term "disability" includes a physical disability that "substantially limits one or more major life activities." 42 U.S.C. § 12102(2).  A "qualified individual with a disability" is defined as an "individual with a disability who, with or without reasonable modification to rules, polices, or practices, the removal or architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt

17

of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

101.    Plaintiff is a qualified individual with a disability within the meaning of the statutes, in that he has impairments which substantially limit one or more major life activities, including his ability to walk. Plaintiff is also being held in pre-trial custody at Rikers in the custody of Defendant City and thus is subject to corrections activities conducted by Defendant City and through its agency the DOC, and thus is eligible to participate in and receive the programs, services, activities, and accommodations provided voluntarily or involuntarily by the Defendants attendant to a pre-trial detention.

102.    Title II of the ADA requires public entities, including Defendants, to operate each of their programs, services, or activities "so that, when viewed in its entirety, it is readily accessible to and useable by individuals with disabilities."  Title II also requires the features of all public entities' facilities to be accessible under the ADA, including buildings, structures, or sites where facilities are located.

103.    Pre-trial detention constitutes a vital program, service, or activity provided by Defendants. Defendants have failed to provide with meaningful access to the programs, services, and activities in violation of the ADA. Defendants have failed to make reasonable or necessary architectural modifications and ongoing maintenance of facilities to provide meaningful access to Plaintiff.

104.    Defendants City and the Individual Defendants have a duty to comply with ADA interpreting and implementing regulations, including 28 Code of Federal Regulations Section 35.152 "Jails, Detention and Correctional Facilities, and community correctional Facilities." This section "applies to public entities that are responsible for the operation or management of adult …

jails, detention and correctional facilities … either directly or through contractual, licensing or other arrangements with public or private entities, in whole or in part, including private correctional facilities."

      a.   Section 35.152 provides that, "public entities shall implement reasonable policies, including physical modifications to additional cells in accordance with the 2010 Standards, so as to ensure that each inmate with a disability … is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing."

      b.   Section 35.152 additionally provides that, "Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity."

     105.   Defendants have failed and continue to fail to provide reasonable accommodations to individuals with mobility disabilities, including Plaintiff, by failing to provide: reasonable accommodations to allow Plaintiff access to appropriate assisted mobility devices, housing in facilities with accessible restrooms, sleeping accommodations, appropriate accommodating structures to bathe, and an absence of stairs and other mobility impediments, and disciplinary measures that do not consist of the inhumane and unjustifiable denial of a disability accommodation for the sole purpose of punishment, and other conduct that discriminates against Plaintiff, thereby depriving Plaintiff of the rights guaranteed by the ADA and accompanying federal regulation applicable to the confinement of individuals with disabilities.

106.     As a result of Defendants' acts and omissions, Plaintiff was and will continue to be denied the reasonable accommodation or the immediate care required, has and will have his liberty unnecessarily and unreasonably restricted, and has and will otherwise suffer injury and damages including, inter alia, physical and mental pain, suffering, humiliation and mental anguish.

<u>SECOND CAUSE OF ACTION</u>
**PURSUANT TO 29 U.S.C. § 794,** *et seq.*
**REHABILITATION ACT OF 1973**
*(Against All Defendants)*

107.     Plaintiff repeats and re-alleges each of the above paragraphs with the same force as if set forth herein.

108.     Section 504 of the Rehabilitation Act provides that "[N]o otherwise qualified individual with a disability...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794.

109.     Plaintiff qualifies as an "individual with a disability" as defined by 29 U.S.C. §705(2))(B) and 42 U.S.C. § 12102(2).

110.     Defendant City, and its agencies, received federal financial assistance for law enforcement and criminal processing related programs and facilities adequate to invoke the coverage of Section 504 at all times relevant herein. 29 U.S.C. § 794(b).

111.     Defendants have failed and continue to fail to provide reasonable accommodations to individuals with mobility disabilities, including Plaintiff; by failing to provide: reasonable accommodations to allow Plaintiff access to appropriate assisted mobility devices; housing in facilities with accessible restrooms, sleeping accommodations, appropriate accommodating structures to bathe; and an absence of stairs and other mobility impediments; and disciplinary measures that do not consist of the inhumane and unjustifiable denial of a disability

20

accommodation for the sole purpose of punishment; and other conduct that discriminates against Plaintiff, thereby depriving Plaintiff of the rights guaranteed by the ADA and accompanying federal regulation applicable to the confinement of individuals with disabilities.

112.    As a result of Defendants' acts and omissions, Plaintiff was denied the reasonable accommodation or immediate care required, has and continues to have his liberty unnecessarily and unreasonably restricted, and otherwise suffers injury and damages including, *inter alia*, physical and mental pain, suffering, humiliation, and mental anguish.

113.    The acts of the Individual Defendants were intentional, wanton, malicious, reckless, and oppressive, thus entitling Plaintiff to an award of punitive damages.

### THIRD CAUSE OF ACTION
### THROUGH 42 U.S.C. § 1983
### DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION
### *(Against the Individual Defendants)*

114.    Plaintiff repeats and incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

115.    By the acts alleged herein, the Individual Defendants, acting under color of state law, in their individual capacities and within the scope of their employment, have deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, and/or failed to intervene to prevent such deprivations, in violation of rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983, including his right to be free from deprivation of liberty, property, and excessive force and excessive punishment without due process of law; to be free from unreasonable searches and seizures, to be free from unconstitutional conditions of confinement and objectively unreasonable conditions of confinement; and to be free from disparate and inhumane treatment and punishment.

21

116.    As a direct and proximate result of the Individual Defendants' acts and omissions, Plaintiff was denied the immediate medical care he required, had his liberty unconstitutionally and unnecessarily restricted, was subjected to unconstitutional conditions of confinement, unreasonable detainments, and excessive force, and otherwise suffered injury and damages described above, including, *inter alia*, physical and mental pain, suffering, humiliation and mental anguish.

117.    The acts of the Individual Defendants were intentional, wanton, malicious, reckless, and oppressive, thus entitling Plaintiff to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**MUNICIPAL LIABILITY PURSUANT TO *MONELL***
**FOR CONTITUTIONAL VIOLATIONS THROUGH 42 U.S.C. § 1983**
***(Against Defendants the City of New York and Corizon)***

118.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

119.    At all times material to this complaint, Defendants City and Corizon had de facto policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct alleged herein.

120.    The acts and omissions described above were carried out by the Individual Defendants pursuant to Defendant City's overlapping customs and practices, and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the Defendant City and its agencies the DOC, and it's medical contractor Defendant Corizon, in their capacities as officials pursuant to customs, policies, usages, practices, procedures and rules of the City, Corizon, and the DOC, all under the supervision of ranking officers of the City, Corizon, and the DOC.

121.    At all times material to this complaint, Defendants City and Corizon were deliberately indifferent to their failure to provide a reasonable accommodation to Individuals with Mobility Disabilities, pursuant to the ADA and Rehabilitation Act, and/or provide adequate medical care for such inmates held in DOC custody at Rikers.

122.    At all times material to this complaint, Defendants City and Corizon failed to properly train, screen, supervise, or discipline employees, and failed to inform the Individual Defendants' supervisors of their need to train, screen, supervise or discipline Individual Defendants as to the applicable requirements of the ADA and Rehabilitation Act, and what constitutes the constitutionally permissible bounds of care for a pre-trial detainee.

123.    Although fully aware that the work of DOC and Corizon, and other municipal personnel demands extensive training, superior judgment, and close supervision, Defendants City, Corizon, and supervising officials failed to properly screen, train, monitor, discipline, and supervise employees and agents, knowing that such failures would result in ADA, Rehabilitation Act, Fourth and Fourteenth Amendment violations. By such acts and omissions, Defendants have acted recklessly and with deliberate indifference to the constitutional rights of those with mobility disabilities who would be subject to pretrial detentions, including Plaintiff.

124.    As a direct and proximate cause of the aforementioned conduct, the City, Corizon, and other supervisorial Defendants and/or personnel have acted recklessly and with deliberate indifference to the constitutional rights of those with mobility disabilities in the context of pretrial detentions.

125.    For decades, through Department reports, civil litigation, and media reports, DOC and Defendant City has been aware of the routine, dangerous, and constitutionally inadequate medical care and disability based discrimination at Rikers Island.

126.    Several entities have conducted major investigations into the failure to accommodate disabilities and patterns of abuse at Rikers Island, including the United States Attorney's Office for the Southern District of New York, the New York City Department of Health and Mental Hygiene, the New York City Department of Investigation, and the New York Times:

a.  The Voluntary Compliance Agreement between the United States of America and The New York City Department of Correction, signed and dated August 5, 2004. Alleging failure to designate responsible employee to coordinate ADA compliance obligations or provide such information to inmates, and instituting remedial measures.

b.  The Voluntary Compliance Agreement between the United States of America and The New York City Department of Correction, signed and dated May 24, 2007, describing the volume of complaint from inmates in City custody alleging that the DOC is operating in violation of Title II of the ADA for, *inter alia*, transporting inmates to and from court appearances, DOC facilities, and medical appointments in vehicles inaccessible to inmates with mobility impairments, and setting forth remedial measures including that "DOC shall immediately discontinue its use of any inaccessible vehicles to transport inmates with mobility impairments" and requiring comprehensive written policies and procedures, and training.

c.  The Voluntary Compliance Agreement between the United States of America, The New York City Department of Correction, and The New York City Health And Hospitals Corporation, signed and dated August 16, 2018, describing periodic letters of investigatory findings dated October 24, 2013, July 22, 2015, and July 6, 2016, and overall findings that at the NIC, which was designated as the primary placement for male inmates with significant mobility and visual impairments, "certain areas inspected did not comply with accessibility standards" and otherwise requiring that disability accommodations meet the legal requirements at present unmet. Also further requiring the City to provide "safe and appropriate assistive devices" such as "wheelchairs.. and other medically necessary equipment, as required to meet the needs of inmates with disabilities."  And requiring any denial of access on the alleged basis of a security or safety concern to be documented and provided to the inmate in writing.

127.    Upon information and belief, Defendants have agreed to cease or slow the above and below detailed violating practices and undertake remedial measures in the past, only to continue to engage in a policy, custom and/or practice of noncompliance.

128.    The problems at Rikers Island are of such a magnitude, The City of New York announced the intent to shut down the whole jail complex.  Former Chief Judge Jonathan Lippman

and City Council Speaker Melissa Mark-Viverito stated: "Rikers Island is an affront to the civic values of New York City. Reforming our jail system and closing Rikers Island is not simply good public policy — it is a moral imperative."[1]

129.    In fact, the plan to phase in the closure of facilities at Rikers is also represented by the City to the United States as a basis for less stringent requirements in the aforementioned Voluntary Compliance Agreement dated August 16, 2018.

130.    At the time of Mr. Isaac's detention, "[t]he company [Corizon] ha[d] been accused by state investigators for medical failures that played a role in up to a dozen deaths at Rikers."[2]

131.    On June 10, 2015, Defendant City announced it would not renew its contract with Defendants Corizon.[3]

132.    New York City Department of Investigation Commissioner Mark G. Peters said, "DOI's investigation found that Corizon did not provide adequate screening or supervision of its employees, and the City did not properly oversee this taxpayer-funded vendor, ignoring multiple red flags."[4]

133.    Defendant City cannot credibly contend that it was unaware of the pattern of inadequate medical care at Rikers Island, and throughout the DOC system, and that they failed to take sufficient measures to investigate, discipline, and end this abuse.

---

[1]     Jonathan Lippman and Melissa Marl-Viverito, *Closing Rikers Island Is a Moral Imperative*, NY Times (March 31, 2017), https://www.nytimes.com/2017/03/31/opinion/closing-rikers-island-is-a-moral-imperative.html?rref=collection%2Ftimestopic%2FRikers%20Island%20Prison%20Complex&action=click&contentCollection=timestopics&region=stream&module=stream_unit&version=latest&contentPlacement=4&pgtype=collection
[2]     Michael Winerip and Michael Schwirtz, *New York City to End Contract With Rikers Health Care Provider*, N.Y. Times (June 10, 2015), https://www.nytimes.com/2015/06/11/nyregion/report-details-failings-of-corizon-rikers-island-health-provider.html?_r=0
[3]     Jillian Jorgensen, *City Drops Corizon, Rikers Island Health Provider, Amid Scrutiny*, Observer.com(June 10, 2015), http://observer.com/2015/06/city-drops-corizon-rikers-island-health-provider-amid-scrutiny/
[4]     Mark G. Peters, *DOI Report finds Significant Breakdowns by Corizon Health, Inc.*, DOI Press Release (June 10, 2015), http://www1.nyc.gov/assets/doi/downloads/pdf/2015/June15/pr16corizonrpt_61015.pdf

134.    Among the deficient policies of medical treatment, the City had a policy, custom, and practice of:

a.  Denying inmates with mobility disabilities the reasonable accommodation of access to an appropriate assisted mobility device;

b.  Denying inmates with mobility disabilities the reasonable accommodation of access to their personal, fitted and prescribed assisted mobility device, while at the same time failing to provide an adequate alternative;

c.  Housing inmates with mobility disabilities in facilities deficient in accommodations to utilize the restroom or toilet or safety utilize the shower, including the failure to house such inmates in facilities with appropriate structural modifications such as stabilization/grab bars;

d.  Providing sleeping accommodations to individuals with mobility disabilities that fail to reasonably accommodate their need and are devoid of necessary cushions or other modifications to prevent pain or injury while attempting to sleep;

e.  Falsely "clearing" individuals with mobility disabilities so as to avoid providing the necessary disability accommodations required by law;

f.  Forcing individuals with mobility disabilities to remain handcuffed to stationary structures for extended periods of time;

g.  Forcing individuals with mobility disabilities to traverse long distances without appropriate accommodations, including without a wheelchair and/or in leg shackles, and unreasonably imposing discipline for the inability to so ambulate.

135.    Defendants have implemented, enforced, encouraged, and sanctioned a policy, practice and/or custom of subjecting pretrial detainees with mobility disabilities, including

Plaintiff, to unconstitutional conditions of confinement in violation of the Fourth and Fourteenth Amendments to the Constitution.

136.    Defendants acted under color of law and with deliberate indifference to the Fourth and Fourteenth Amendment rights of Plaintiff.  As a direct and proximate result of the acts and omissions of the Defendants the Fourth and Fourteenth Amendment rights of the Plaintiff have been violated.

137.    The policies, practices, customs, and usages, and the failure to properly train, screen, supervise, or discipline, were a direct and proximate cause of the unconstitutional conduct alleged herein, causing injury and damage in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth Amendment and the Due Process Clause of the Fourteenth Amendment.

138.    As a result of the foregoing, Plaintiff denied medical assistance and accommodation required by law, was deprived of liberty, suffered physical injury, conscious pain and suffering, emotional distress, humiliation, costs and expenses, and was otherwise damaged and injured.

## FIFTH CAUSE OF ACTION
### PURSUANT TO N.Y.C. ADMIN. CODE § 8-101 et. seq.
### VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW
### (*Against all Defendants*)

139.    Plaintiff reiterates the above paragraphs as if set forth herein and incorporates such by reference.

140.    The New York City Human Rights Law (NYCHRL) was enacted for the purpose of eliminating "prejudice, intolerance, bigotry, and discrimination." The NYCHRL provides that it shall be unlawful discriminatory practice for any person, place or provider of public accommodation to discriminate against a person with a disability either directly or indirectly, or

deny such persons of the accommodations, advantages, facilities, or privileges thereof. N.Y.C. Admin. Code § 8-107(4).

141.    Plaintiff has a "disability" as defined by N.Y.C. Admin. Code § 8-102(16)(a) and have "physical impairments."

142.    The City of New York and its agencies are "persons" or "providers" or "covered entities".   N.Y.C. Admin. Code § 8-102(1). Defendants are "places and providers of public accommodation." N.Y.C. Admin. Code § 8-102(9).  The Individual Defendants are "agents" and "employees" of a public accommodation. N.Y.C. Admin. Code § 8-107(4).

143.    Defendants failed, and continue to fail, "to make reasonable accommodation to enable a person with a disability to... enjoy the right or rights in question," as described above. N.Y.C. Admin. Code § 8-107(15).  Defendants have unlawfully discriminated against Plaintiff by failing to accommodate his mobility disability during his detention.  Defendants actions result in systemic discriminatory exclusion in violation of N.Y.C. Admin. Code § 8-107(17).

144.    As a result of Defendants' acts and omissions, Plaintiff was and is denied the reasonable accommodation or immediate care required, has his liberty unnecessarily and unreasonably restricted, and otherwise suffers injury and damages including, *inter alia*, physical and mental pain, suffering, humiliation and mental anguish.

145.    The acts of the Individual Defendants were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

[this portion intentionally left blank]

28

## JURY DEMAND

1.  Plaintiff demands a trial by jury in this action on each and every one of his damage claims.

           WHEREFORE, Plaintiff demands judgment against the Defendants individually and jointly and prays for relief as follows:

I.  Award Plaintiff punitive damages in an amount to be determined at trial;

II.  Award Plaintiff compensatory damages in an amount to be determined at trial;

III.  Award Plaintiff reasonable attorneys' fees and costs as authorized pursuant to 42 U.S.C. §§ 1988 and 12205; and

IV.  Grant such other further and different relief as to the Court may seem just and proper.

Dated:   New York, New York
           March 17, 2021

                                  Respectfully submitted,

                         By:   _____
                              David. B. Rankin
                              Rebecca L. Pattiz
                              Beldock Levine & Hoffman LLP
                              *Attorneys for Plaintiff*
                              99 Park Avenue, PH/26th Floor
                              New York, New York 10016
                              P: 212-490-0400
                              E: drankin@blhny.com